# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO
_____

GALE ROBERTS, individually and
d/b/a "Gone Working" (Pro Se),

        Plaintiffs,

vs.                                                            No. 18-cv-00975-WJ-LF

GENERATION NEXT, LLC, RICHARD COOK,
Estate of, KATHARINE COOK FISHMAN,
PAUL MATTHEW CASTER, ANTIQUITY ENCOUNTER,
JOHN MELANCON, EXPEDITION RESOURCES, LLC,
EXPLORATION OPES, LLC, DONALD PATTERSON,
GERALD KEMLAR, HOWARD TALKS,
WILLIAM FLOTO, JOHN AND JANE DOES,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u><br><u>and</u><br><u>DENYING/STRIKING MOTIONS RECENTLY FILED BY PLAINTIFF</u>

THIS MATTER comes before the Court upon the following motions or matters:

(1) Motion for Summary Judgment by Defendant Expedition Resources, LLC ("Expedition"), filed February 26, 2020 (**Doc. 94**);

(2) Motion for Summary Judgment by Defendant Patterson, filed February 26, 2020 (**Doc. 96**);

(3)  Motion for Hearing by Defendant Expedition, filed March 9, 2020 (**Doc. 97**);

(4)  Plaintiff's "Response" To Defendant's Reply in Support of Motion for Summary Judgment, filed April 15, 2020 (**Doc. 103**);

(5) Plaintiff's Motion for Extension of Time to File Proposed Pretrial Report, filed April 13, 2020 (**Doc. 104**);

(6) Plaintiff's Motion to Admit New Evidence, filed April 14, 2020 (**Doc. 105**); and

(7) Plaintiff's Motion to Ignore Filing and Grant Permission to Re-file, filed April 15, 2020 **(Doc. 106).**

Having reviewed the parties' pleadings and the applicable law, the Court has decided that Defendant's motion for a hearing (Doc. 97) shall be DENIED; Defendants' motions for summary judgment shall be GRANTED (Docs. 94 and 96); Plaintiff's motions (Docs. 104, 105 and 106) shall be DENIED; and that Plaintiff's Response to Defendant's Reply (Doc. 103) shall be STRICKEN.

## BACKGROUND

This lawsuit is about a hunt for buried treasure on Black Mesa, a hill area located northwest of Espanola, New Mexico where some believe that several large caches of gold treasure and antiquities are hidden in Spanish Vaults.  Plaintiff Roberts is proceeding pro se and is a resident of Wyoming who conducted business in New Mexico, Texas and Florida. He claims that he contractually agreed with Defendants Melancon, Patterson, Kemler and Talks, to fund a gold treasure exploration mission near Espanola, New Mexico, known as the "Black Mesa Expedition." In the complaint Plaintiff alleges that the other individuals on the expedition conspired against him to steal buried gold from Black Mesa land owned by one of the Cook Defendants and stashed it elsewhere; and that the theft was part of a scheme to prevent Plaintiff from discovering hidden reserves of gold in order to deprive him of his share.

Defendants Expedition and Patterson are the only remaining named Defendants in this case. Defendant Expedition is represented by counsel, while Defendant Patterson and Plaintiff Roberts are proceeding *pro se.* The Court's previous rulings have narrowed the remaining parties and claims in this case. *See, e.g.,* Docs. 53, 54, 58, 62, 67, 69 and 70.  The following facts are gleaned

from those past decisions and are relevant to the factual context necessary to address the summary judgment motions.

## I.    Relevant Chronological Background Facts As Alleged in the Complaint

November 2012: According to the complaint, Plaintiff entered into a Joint Venture Agreement in November 2012 with Defendants Patterson/Expedition Resources, which was captioned as a "Memorandum of Understanding for a Joint Venture Agreement." Doc. 3 at 48 (also referred to as the "New Agreement" by Plaintiff, *see* Doc. 3, ¶¶44, 53). Under its terms, Plaintiff was to pay all costs and would be entitled to a 50/50 split in discovered uncovered gold and artifacts. The agreement was brokered by Defendant Melancon with the approval of Richard Cook, who owned the treasure maps used in the expedition and whose company, Generation Next, LLC ("Gen Next") owned property on Black Mesa.  Doc. 3, ¶46.[1]

March 2013: Using testing equipment Roberts had purchased specifically for the expedition, two gold targets were located. As the targets were located, tension grew between him and Defendants Patterson and Kemler. Although unknown to Plaintiff at the time, Defendants Patterson and Kemler located two other gold targets with the help of Defendant William "Bill" Floto, who was flown up from Florida, using Floto's "proprietary science." Doc. 3, ¶62.

March 6, 2013: in Plaintiff's absence, the Melancon team members—Defendants Patterson, Kemler and Floto—dug up the gold in one of these two targets and secreted it away. These men then hid the Bill Floto's test results and manufactured false results in their place in order to deceive Plaintiff about these other two locations where gold was hidden.

March 15, 2013: Plaintiff met Richard Cook for the first time, during which time Cook related the story about treasure hidden by robbers that held up a pack train of mules hauling gold and silver coins in the late 1800's ("OJO Robbery"). Doc. 3, ¶73.

March 16, 2013: with the permission of Richard Cook and Defendant Caster, the excavation to locate the Spanish Vaults on Black Mesa began. Doc. 3, ¶74. The team was several days into the excavation when Plaintiff Roberts discovered that Defendant Kemler had tried to hide the test results from March 6, 2013 in his personal notebook. *Id.,* ¶74.

---

[1] Richard Cook died in 2016. His daughter, Katherine Fishman, is the personal representative of Mr. Cook's estate and was also legal counsel for the company Generation Next, LLC.

Mid-March 2013: Defendants Patterson and Kemler informed Plaintiff that they needed to return to Florida. Plaintiff intended to use the time they were away to report his concerns regarding suspicious activity at the expedition site to Cook and Melancon. Doc. 3, ¶78.

March 24, 2013: Defendants Patterson and Kemler began transporting the gold and artifacts they had secretly removed and took them to Florida. Doc. 3, ¶82.

May 1 - Sept 13th, 2013: Plaintiff pleaded with Defendants Melancon, Fishman and Caster to meet with him and resolve everything, but Defendants remained silent and waited for the agreements to expire. Doc. 3, ¶ 99.

Mid- to late September 2013: Plaintiff and Richard Cook entered into a verbal agreement to allow Plaintiff to finish the excavation of the gold from the Spanish Vaults on Black Mesa. However, Defendants Caster and Fishman would not allow Roberts to return to the Black Mesa property. Fishman filed for restraining order against Plaintiff which limited direct communication between Plaintiff and the Cook family.[2] Doc. 3, ¶¶101, 106-115.

Feb 21, 2014: Gen Next sent Plaintiff e-mail claiming that all contracts had expired; that Black Mesa Expedition had ended poorly for all involved; and that they had no intention of any further expedition of Black Mesa. However, Plaintiff was aware that two weeks later, Defendants Patterson, Kemler and Floto had located and removed gold from Black Mesa on March 6, 2013. Plaintiff also discovered that about two weeks later, Defendant Gen Next, Fishman and Caster renewed efforts to recover gold and artifacts from Chamber #1 of the Spanish Vaults at Black Mesa. Doc. 3, ¶¶130, 132.

## II.   Relevant Agreements

The complaint refers to three agreements or contracts that were relevant to the expedition.

The first was a contract between Gen Next and Defendant Expedition Resources, executed in July 2010. This was a one-year exclusive Recovery Agreement allowing Defendant Expedition Resources the right to access the property for exploration. Doc. 3 at 45. The agreement expired on

---

[2] Plaintiff began sending threatening e-mails to the Cook family in September 2013, accusing them of criminal behavior and conspiracy. Members of the Cook family responded by seeking and eventually obtained a state court restraining order that limited Plaintiff's communication with the Cooks, based on their claims that Plaintiff began to act irrationally and that he ambushed 87 year-old Richard Cook at his home in an attempt to gain entry to Black Mesa. *See* Doc. 54 at 14; Docs. 23-1 & 23-2 (Application for restraining order and state court order).

July 22, 2011 without Expedition Resources ever having entered the property due to a lack of funding. Am. Compl., ¶41.

The second agreement is the 2012 Joint Venture Agreement, which is most relevant to the issues raised in this motion. This agreement was between Plaintiff and Defendants Patterson/Expedition Resources. It is captioned as a "Memorandum of Understanding for a Joint Venture Agreement." Doc. 3 at 48. This agreement identifies and refers to Plaintiff throughout as "GW" which is the anacronym for his company "Gone Working." Under the Joint Venture Agreement, the purpose of the expedition was "to locate, recover inventory, value and sell or distribute to the Joint Venturers the natural and cultural precious metals, gems, or artifacts." Doc. 3 at 49. The signatories to the agreement are Gale Roberts as a "Joint Venturer" and Donald Patterson as Managing Member of Expedition Resources, LLC, and the agreement was signed by both signatories on November 26, 2012. Under the agreement, Plaintiff was required to pay all costs and monthly salaries of $2,000 to Defendants Melancon, Patterson and Kemler. In return, Plaintiff would receive a 50%  share of the value of whatever treasure was recovered, and his costs would be reimbursed prior to any distribution of the liquidated assets recovered as well.  Doc. 94-1 at 6 (Article V-"Allocations and Distributions").

The third agreement relevant to this case is the Black Mesa Recovery Agreement, dated February 12, 2013 (referred to by Plaintiff as the "New Agreement," *see* Doc. 3, ¶¶44 & 53). This was an exclusive contract between Defendants Gen Next and Melancon/Antiquity Encounter. *See* Doc. 23-1 at 3. Defendants Richard Cook and Fishman signed this agreement as Co-Managers of Gen Next.

As will be discussed further on, the only agreement relevant to the case at this point is the Joint Venture Agreement.

### III.     Remaining Parties and Claims

Defendants Expedition and Patterson, who are the movants in the motions now before the Court, are the two remaining named defendants, as well as John and Jane Does who have never been named in the year-and-a-half this case has been pending.  The Court has also entered a default judgment against Paul Caster, *see* Docs. 20 & 48.[3]

On May 2, 2019, the Court denied a motion to dismiss filed by the "Expedition Defendants," which included Defendant Expedition and Defendant Patterson (who is a managing member of the company). Doc. 62.  The Court concluded that only several claims survived against these defendants, based on grounds of both timeliness and failure to state a claim under Fed.F.Civ.P.12(b)(6).  These are now the only remaining claims:

> Count 4: Breach of Contract
> Count 8: Breach of Covenant of Good Faith and Fair Dealing
> Counts 10 and 11: – Promissory Estoppel and Quantum Meruit/Unjust Enrichment.[4]

For some reason, Defendant Expedition filed two briefs as part of its motion for summary judgment: Documents 94 and 95 which are respectively Expedition's "Motion" (35 pages long) and a "D.N.M.L.R. 56.1 Memorandum Regarding Summary Judgment" (6 pages long).  In a similar vein, Plaintiff filed two responses to Expedition's motion for summary judgment (one to the motion and the other to Defendant's "memorandum"); and two responses (Docs. 99 and 100)to Patterson's single motion for summary judgment. Plaintiff also filed two responses (Docs. 99 and 100) to Defendant Patterson's motion for summary judgment (Doc. 96). Filing these duplicative pleadings violates the federal procedural rules as well as this Court's local rules with respect to the

---

[3] The Court will enter a separate Order regarding the disposition of Plaintiff's lawsuit against Defendant Caster.

[4] Defendants have figured correctly that only these claims remain. Doc. 94 at 4. Plaintiff is under the impression that there are still eight remaining claims against Defendants Expedition and Patterson, *see* Doc. 98 at 4, overlooking this Court's previous rulings dismissing various claims and parties.

filing of motions and page limitations.  *See* Fed.R.Civ. P. 56; D.N.M.LR-56.1 (summary judgment); D.N.M.LR-7.5 (page limitations). The Court considered striking all of these pleadings and requiring the parties to refile them in a manner that complies with the Court's rules, but decided in the interest of judicial efficiency to proceed with the pleadings that have already been filed but declining review of  any portions which appear to be cumulative.

In addition, Plaintiff has included over 130 exhibits for each of his responses, which violates the local rule pertaining to the allowable number of exhibits without the opposing party's stipulation.  *See* D.N.M.LR-Civ. 10.5. The Court has not found any such stipulation to the excess pages and therefore need not consider them, although they appear to be largely cumulative.  A good number of these exhibits are listed as "support" for Plaintiff's facts, but are not referenced at all otherwise in Plaintiff's briefs and not marked or highlighted for the Court's attention, which is a further violation of the local rules.  *See* D.N.M.LR-Civ. 10.6 (Identifying Portions of Exhibits).

## V.     Facts Relevant to Summary Judgment Motions[5]

A.     <u>Defendant's Facts:</u> On November 26, 2012, Donald Patterson, as Managing Member for Expedition Resources, LLC and Gale Roberts signed a Joint Venture Agreement ("Agreement"). Doc. 94-1.  The property on which the alleged gold and artifacts were located was and is owned by the Cook family.  Plaintiff does not own the property.

In the Agreement, Plaintiff agreed to provide, among other things, food, lodging, equipment, funding, and salaries to Expedition Resources personnel for the expedition. He agreed

---

[5] These facts are taken from Defendants' briefs, Docs. 95 and 96 and Plaintiff's briefs, Docs. 98 and 100. The Court omits any facts, whether or not disputed, that are not relevant or material to the remaining claims against Defendants.  For example, it is irrelevant that Patterson burst into anger at Plaintiff for trying to make his own deal with Cook to excavate on his land behind Patterson's back, whether or not it is undisputed.  *See* P's Fact 12. Plaintiff has offered as "evidence" three audiotapes titled "Audio of Donald Patterson Threatening Me." Doc. 98-3, 98-16 and 98-17.  The Court listened to one of these audio recordings and after determining that they are not relevant or material for purposes of the summary judgment motions, did not listen to the other two.

that any capital he contributed was "risk capital" and Expedition Resources would not have any extending liabilities if the venture produced no results.  *Id.* at 6.  He also agreed that the amounts he contributed to the venture would be paid, prior to distribution, "upon liquidation of items recovered and/or the assets recovered." *Id.*

The expedition was not successful; no gold or artifacts were located during the expedition. According to Patterson, neither himself nor any "friend, family member or associate . . . ever located gold, artifacts, and or treasure of any kind from the failed Black Mesa Expedition, or the Black Mesa Property at any time before, during, or after the expedition concluded." Doc. 94-2 (Patterson Affidavit).[6]

Under the Agreement, Plaintiff is not entitled to any compensation or reimbursement until gold and other artifacts are recovered. (See, Exhibit A to Motion for Summary Judgment, supra.).

Expedition Resources, LLC was evicted from the property in April 17, 2013.  On October 23, 2013, Plaintiff was barred by a state court protective order from entering the Cook property. He was permitted to meet with Richard Cook only in the company of Matthew Caster or Kate Katherine Fishman.

B.    Plaintiff's Facts

Plaintiff disputes Defendant's statement that the expedition was not successful in that no gold or artifacts were located; and contends that he would be entitled to recovery had Defendants

---

[6] Patterson's Affidavit is unsworn and does not strictly conform to Rule 56 requirements but the Court still considered it because such evidence need not  be in the form that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005); *see also Ruby v. Springfield R-12 Pub. Sch. Dist.,* 76 F.3d 909, 912 (8th Cir. 1996) ("The general rule is that defects in the form of the affidavits are waived if not objected to at the trial court level. Absent a motion to strike or other timely objection, the trial court may consider a document which fails to conform to the formal requirements of Rule 56."). The Court also recognizes that Patterson is proceeding pro se, and that his Affidavit statements are still based on personal knowledge, which the Court finds is a critical requirement.  *Gross v. Burggraf Constr. Co*., 53 F.3d 1531, 1541 (10th Cir.1995).

not stolen the treasure. Therefore, for purposes of summary judgment, Plaintiff must submit some evidence to dispute Defendant's facts which would infer to a reasonable fact finder that gold was in fact located under one of the GPS locations, that gold was dug up and found by Defendants, and are now depriving Plaintiff of his share of the treasure. Unfortunately, Plaintiff's "evidence" does not offer any material that would rebut Defendant's statements of fact.

C.  Plaintiff's Exhibits

Plaintiff's submits over 350 pages of exhibits that are common to both summary judgment motions, but they are largely cumulative and belong to only a few categories:

- The Black Mesa Progress Report: this is Patterson's 20-page investigation to determine whether artifacts and "items of interest" were hidden beneath Black Mesa. *See* Doc. 99-4 at 3. The report is a dense collection of various archeological and geophysical field surveys; interpretative reports relating to electromagnetic induction data acquisition and ground penetrating radar surveys; and satellite pictures showing data dating at different times and showing geological underground "anomalies." The report references a "long time associate, whom [sic] is an independent engineer" who came to the test site at Black Mesa to evaluate the test results and determined that "Zones 1 and 2 did in fact test positive for gold with his transducer. . . ." Doc. 98-4 at 7-8. The report states that an "air machine" was also deployed which received a +2000 "flux flow signal pinpoint" as compared to other locations that had no "positive response at all." *Id.* The report appears to be the reason the Joint Venturers planned the expedition searching for gold at Black Mesa.

- Discovery material (Plaintiff's initial disclosures and Defendant's responses to Requests for Admission);[7] pictures of various equipment used on the expedition; satellite images and readings, and raw data sheets (also included in the video presentations, *see* below). *See, e.g.,* Doc. 98-1 at 12 (document stating that the "project objectives are the location, assessment and conservation of "cultural resource material.");

- Miscellaneous material, such as:

  o  the "Black Mesa Experiment: Owner- Gale Roberts" which is more or less a written version of Plaintiff's videos, complete with pages of data and satellite images;

  o  publications labeling Defendants as fraudulent. *See, e.g.,* Doc. 98-2 ("Dr. John Melancon or Dr. CON"); Doc. 98-20 at 2 ("The only thing worse than a Phony Archeologist whose riding in on a camel for a photo opp . . . is a Phony

---

[7] The purposes of this discovery material is unclear, since Plaintiff did not reference these materials in his brief, as he was required to do under the local rules. *See* D.N.M.LR-Civ.10.5 (a party may file only exhibits which are brought to the Court's attention) and 10.6 (Identifying Portions of Exhibits).

Archeologist who comes riding in on a camel for a photo opp PACKING THE BIBLE!"; and "What is truly AMAZING is that John Melancon was able to become Dr. John Melancon, with a PHD in Archeology WITHOUT apparently having to spend ONE Minute Attending Class in the College of Archeology at Trinity Southwest University.");

o   threatening and aggressive e-mails sent by Plaintiff to Floto. *See* Doc. 99-9 at 6 ("You must know that I have NOT played my whole hand Jerry knowing that you and or Don would not come clean. Now it is going to get very interesting as I really turn up the heat in Key West. I am done gathering my evidence that you committed fraud and that . . . [you] decided to join in a conspiracy to cut me out of the deal all together"; Doc. 99-9 at 7 ("There is a very good reason that I waited until now to launch a global search for the gold you stole").

Probably the most significant of Plaintiff's exhibits is a series of eight home-produced audio-visual recordings, all narrated by Plaintiff, most of them at least a half-hour long. The production style uses graphics (including cartoon pictures of treasure chests full of gold and cartoon-like caricatures of Defendants that are moved across the screen), photos, short video footage and audio clips. They unfold a story about a treasure hunt and a group of scientists, casting Defendants in the nefarious role of the "Black Mesa Bandits."[8]

None of these "exhibits" have been lodged with the Court as evidence.  Instead, they are tendered as exhibits identifying where to find them on the "Vimeo" website, along with a password for the Court to access and view them.  Docs. 98-3, 98-5, 98-6, 98-7 and 98-10 (Exhibits 3, 5, 6, 7 and 10, 16, 17 and 18).[9] Plaintiff relies largely on these videos to dispute Defendant's facts, apparently oblivious to their inappropriateness as admissible evidence.  In considering these videos, the Court has indulged Plaintiff because of his pro se status and to afford Plaintiff the full process

---

[8] Plaintiff duplicates much of the evidence used in the video as "paper" exhibits.  For example, the satellite picture of land plats are included in the survey report, Exhibit 4 (Doc. 99-4, Black Mesa Progress Report), and the "raw data sheet" is Exhibit 8 (Doc. 98-8).

[9] The Court was unable to view Exhibit 6 (Doc. 98-6, "Searching for an Investor") because the password did not open the video, despite several attempts by the Court.  Also, as mentioned earlier (*see* note 5, *supra*), Plaintiff includes three audio recordings of Patterson "threatening" him, (Docs. 98-3, 98-16 and 98-17).  The Court discusses only Exhibit 3 (Doc. 98-3) here, since after listening to Exhibit 3, is convinced that the other two recordings are as just as irrelevant.

he is due in litigating his case.  However, none of these videos offer any evidence to suggest either that gold was located at any of the "potential" sites or that any of this "gold" was stolen by anyone and therefore offer no relevant or material information that would refute Defendants' facts.  A description of the information in each of the videos viewed by the Court follows.

Vimeo Exhibit 5, Doc. 98-5 ("Finding Richard [Cook's] Gold"):  In this video, Plaintiff describes events leading up to the Joint Venture Agreement and how he and Patterson located two sites for gold lying in the Spanish Vault underneath the Black Mesa hills (Melancon was not at the site because of health problems).  Using basic computer graphics, Plaintiff explains how his "long-range" ground penetrating radar equipment was critical to the success of the venture—along with Richard Cook's treasure map, "secret" rock markings and an "All-Seeing Eye" rock formation resembling the symbol that is printed on the United States Treasury bill.  The video includes footage of Patterson walking around the rocks with the scanner and showing how radar screens show the presence of "non-ferrous targets" below ground.  It ends with Plaintiff stating that he was initially elated at finally locating non-ferrous material on Richard Cook's Black Mesa property (so elated at the thought of striking gold that he slept with a loaded revolver under his pillow), but then the venture took a "turn for the worse."  This video presents no evidence at all of any kind that the "non-ferrous" targets were in fact gold (as opposed to other non-ferrous metals such as aluminum, brass, copper, nickel, tin, lead, and zinc) or that any material was ever excavated from the site.  In short, Vimeo Exhibit 5, "Finding Richard's Gold," offers no evidence at all that "Richard's gold" was found.

Vimeo Exhibit 3, Doc. 98-3 ("Audio of Donald Patterson Threatening Me."  In this recording, one can hear someone (the Court assumes this is Patterson) talking to Plaintiff in an aggressive manner, accusing Plaintiff of "circumventing" him by trying to make his own deal on

the side by approaching Cook to ask for permission to start digging on his property.  Plaintiff explained that he went to Cook on his own because Melancon was in the hospital and said it wouldn't happen again.  Patterson told Plaintiff that this wasn't the first time he had circumvented him, and that after this "deal" was over, he would not work with him anymore.

Vimeo Exhibit 7, Doc. 98-7 ("Stealing Richard's Gold"):  Plaintiff believes that this video presents a "mountain of circumstantial evidence" showing that Patterson, Kemler and Floto stole the gold on Black Mesa.  Using cartoon images and pictures of the site, Plaintiff explains that these three defendants went back up to the site to validate the targets that had been located a few weeks earlier by Plaintiff and Patterson.  Using Floto's "proprietary equipment" which was used to pick up spikes in electrical current, they were able to locate yet another GPS location for a gold cache.  The video shows pictures of several pages of "raw data" compiled by the three defendants.  Plaintiff refers to this as the "smoking gun" which he claims was hidden by the three defendants and discovered later by Plaintiff.  This video also shows pages of "faked" data containing "inverse numbers" reflecting a position lying 180 degrees to the opposite side of Floto's equipment, in order to mask the true GPS locations.

Plaintiff also shows pictures of what he calls the "crime scene," which appears to be an area of earth where some digging may have occurred before it was backfilled.  He claims that Floto's plotting of bearings would have intersected here, thus proving that treasure was buried directly beneath that spot.  Plaintiff includes what he describes as Patterson's "subconscious confession," which is an audio snippet of Patterson "admitting" to using the "inverse numbers" which, when plotted, intersect through the "crime scene."

On this video, Plaintiff claims he has "proof" that gold was indeed located the site because Floto's brother Steve (who is a scientist) told Plaintiff that he agreed "100%" that gold was located

beneath the GPS locations determined by Floto's equipment.  Plaintiff also states on the video that he has "proof" that Floto stole the gold because Steve told him that his brother Floto was dishonest enough to steal the gold.  In his narrative, Plaintiff suggests to any law enforcement agencies that may be watching the video that these three defendants are getting the help they need to launder the gold from their financier from Florida, Howard Talks, who funded a large part of the expedition.

Even if Steve's comments were not inadmissible hearsay in a form that is unacceptable even for summary judgment purposes, the comments cannot be considered "circumstantial evidence" either that gold was located, found or stolen by Floto, Patterson and Kemler.  Plaintiff asks the Court to jump to the conclusion that the "non-ferrous targets" lying beneath Black Mesa are in fact gold, based on a treasure map, secret rock markings and radar reports; and that Floto, Patterson and Kemler excavated this gold and hid it from Plaintiff, based on data sheets with mathematical calculations and an area of possibly backfilled earth.  Summary judgment is premised on evidence and facts and not optimistic conjecture, and thus the Court finds that Vimeo Exhibit 7, "Stealing Richard's Gold," offers no evidence at all that any gold was ever stolen from Black Mesa.[10]

Vimeo Exhibit 10, Doc. 98-10 ("Laundering Richard's Gold"):  This half-hour video opens with a picture of a prison yard and a caricature of Defendants whom Plaintiff vilifies as the "Black Mesa Bandits."  Plaintiff claims he has "proof" of why he believes the Defendants are out laundering gold "around the world" based on his own "independent investigation" which consisted of hours of recorded telephone calls to Defendants' business partners and acquaintances who

---

[10] One of the arguments raised by Defendants is that Plaintiff cannot support his claims without an expert, and the Court takes up this argument below.

purportedly helped Patterson and Melancon launder the gold and silver found on Black Mesa. The video contains excerpts from two and a half hours of these calls.[11]

One "example" of this "proof" are excerpts from 2.5 hours of phone calls made by Plaintiff to Patterson's Florida friend Fred Gaff.  On that call, Gaff told Plaintiff that he gave Patterson $90,000 in cash "on a handshake" which Patterson used to retrofit a 40-foot boat and buy certain equipment for a treasure hunt.  Gaff also said that he had bought some "modern gold" and "modern silver" and "buried it" instead of putting it in a bank because the "government has access to banks" and he "doesn't trust those boys."  Gaff also mentioned that the gold was "non-traceable and clean." When questioned what he meant by "modern" gold and silver, Gaff told Plaintiff that "they're making 'Double Eagles' right now."[12]  Plaintiff believes that this interchange proves that Patterson gave Gaff $200,000 of the gold treasure in exchange for $90,000 in cash because (1) why else would Gaff give Patterson $90,000 on a handshake; (2) if Gaff wanted to fund the expedition, why didn't he give Patterson this cash before when the expedition was looking for investors?; (3) why else would Gaff bury the gold he bought instead of putting it in a bank?; and (4) why would Gaff describe the gold he bought as "non-traceable and clean" if it were *not* stolen booty, since those are terms that are typically associated with stolen property that no one could trace?

---

[11] There is no way to determine the authenticity of these phone calls, and there may be reason to believe they may have been patched together by Plaintiff: the sound quality in Plaintiff's voice on these calls is satisfactory and is identical to his narrative "voice-overs," but the sound quality of the voices at the other end of the conversation is so poor that the voices are difficult to hear and comprehend. In fact, Plaintiff has added subtitles for those voices.

[12] A "double eagle" gold coin has a denomination of $20 and according to Wikipedia, was produced regularly until the passage of the Gold Reserve Act which changed the price of gold.  https://en.wikipedia.org/wiki/Double_eagle. Prior to 1850, "eagles" with a denomination of $10 were the largest denomination of U.S. coin, *id.,* and so it seems implausible that the source of the "double eagles" bought by Fred Gaff was part of a cache of gold treasure and antiquities hidden in Spanish Vaults under the Black Mesa hills.  Interestingly, a quick internet search indicates that double eagle coins can still be bought on eBay.

Plaintiff does not clarify whether the "expedition" referred to in this conversation is the Black Mesa Expedition or a subsequent expedition Patterson was involved in (and which is referred to in a later recorded conversation with Melancon).  Either way, none of the "facts" from this recorded conversation suggests that Patterson did anything more than accept a loan on a handshake from Gaff, and that Gaff recently bought "modern" coins which he decided to bury in the ground because he did not trust banks.  Plaintiff engages in little more than wishful thinking in offering this conversation as evidence that Defendants were laundering the gold they had secretly excavated from Black Mesa.

The second recorded telephone conversation is a 6.5 minute portion of 3.5 hours of recorded calls with Melancon. Plaintiff provides no date for the call, but it was apparently made some time after the Black Mesa Expedition.  In that call, Melancon told Plaintiff that "they" (the Court assumes "they" refers to Patterson and Melancon) had located an even bigger cache of gold in an "ancient paleo Indian cultural site" after paying $1.4 million to a geologist who owns an offshore satellite company to fly over Black Mesa and scan the area for three weeks.  Melancon described the find as "12 f-----g rooms full of gold" on Richard Cook's property and that it was something "way bigger" than anything they had been looking at before, paling in comparison to the "lost City of Cibola"[13]  He told Plaintiff there were rooms filled with stacks of gold "14 meters by 70 meters" and even larger--, and another room full of geometrical shaped piles of gold in circles and squares and triangles.  Melancon said that the cache was so large that it was "enough

<hr/>

[13] In his videos, Plaintiff refers to and includes photos of, articles on the Seven Lost Cities of Cibola, which is a myth that was popular in the 16th century.  An internet search indicates that the myth was created when shipwrecked survivors from a failed 12th century Spanish expedition to what is now New Mexico reported that they had heard stories from natives about cities with great and limitless riches.

Melancon was quite excited in his graphic descriptions of the treasure, telling Plaintiff that it was "much bigger than you could f-----g imagine," and "if you knew what we were f-----g digging on top of you would have a f-----g heart attack because I almost did. . . I almost fell the f—k over."

to erase the national debt overnight" and that the federal government would never allow Cook to keep it.

Melancon also said that he had approached a law firm in Washington, D.C. which was offering him an opportunity to present this information "to the highest level" (in the video, Plaintiff includes a graphic that includes a picture of former United States President Barack Obama against the backdrop of the White House).

Plaintiff's take on this conversation is that Melancon's discovery is "big-time laundering" which should attract federal agencies, especially Homeland Security, since it affects our national interest because of the size of the treasure.  Plaintiff is also nagged by these questions: (1) did Melancon and Patterson really uncover enough gold to erase the national debt overnight? and  (2) who is the geologist who owns the offshore satellite company?  Plaintiff offers a reward to anyone who recognizes the geologist's name which was mentioned by Melancon (but which was undecipherable) through a "tipline" shown at the end of the video; and (3) where did they get the $1.4 million to pay for the satellite scan?

Plaintiff believes that this conversation with Melancon proves that Defendants stole told from the Black Mesa site because they would not otherwise have found a way to come up with $1.4 million to fund the satellite scan.  This is sheer speculation: Aside from the fact that Plaintiff offers no physical or factual evidence to bolster his assumption, he does not even consider that it could have been a loan.  Further, a reasonable juror would not infer from this video that the $1.4 million Defendants paid to the satellite company came from gold excavated from the Spanish Vaults under Black Mesa.

Vimeo Exhibit 18, Doc. 98-18 ("The Beast Wants to EAT ME!"):  Not only is this video irrelevant and immaterial to Plaintiff's claims in this case; it is also the most gratuitously

denigrating to Defendants.  Plaintiff claims that Patterson is a "deranged criminal" who has threatened to hunt him down and kill him and as evidence of this claim, Plaintiff offers select audio snippets from recorded telephone conversations with Patterson screaming at Plaintiff such things as: "Your ass belongs to me, mother!"; "Now you got the Beast!"; "go ahead and call the FBI- I'm going to hunt you down and f—k you up.! Plaintiff explains that Patterson is especially dangerous because he has the physical skills to carry out this threat, as a former member of the Navy Special Forces.

Plaintiff presents these audio snippets of Patterson's threats without any context of surrounding conversation except for his own narrative.  He pronounces (without any evidentiary support) that Patterson's anger stems the fact that he "faces prison time" if he cannot get Plaintiff to "go away."  However, the content of those audio segments suggests that Patterson may have been the one who was fed up with Plaintiff, and not the other way around.  In one clip, Patterson shouts that Plaintiff is "disturbed" and tells him that "it's my turn—I've had enough of your shit!").  Plaintiff has admitted that he contacted Patterson's business liaisons to "investigate" Patterson's theft of the gold and that he threatened to call the FBI about alleged crimes committed by Patterson.  Thus, Patterson's demeanor and threats would not be inconsistent with someone who felt relentlessly hounded by someone accusing him of stealing gold treasure and conspiring to deprive him of his share—when nothing of the sort had occurred.

This video has no relevance to the remaining issues in this case.  While it does indicate that Patterson is supremely upset and angry at Plaintiff, Patterson's feelings toward Plaintiff are immaterial to whether Defendants breached the Joint Venture Agreement.

These videos as a group, were mildly entertaining, although they became somewhat tedious after a while in their repetition and length.  The Court has reviewed all of the videos (with the

17

exceptions of those few that were either cumulative or that the Court was unable to open, *see* n. 7, *supra*) and finds that there is no evidence in any of them which would create a factual dispute regarding whether gold treasure was buried, found or stolen by Defendants during the Black Mesa Expedition—even when viewing the videos and other evidence favorably to Plaintiff.  In short, none of the videos presents any evidence to refute Defendants' position that they found no gold on Black Mesa.

## VI.    Defendant Expedition's Motion for Oral Argument (Doc. 97)

Both parties request oral argument on the summary judgment motions.  *See* Doc. 99 at 11 (Plaintiff's request). Defendant Expedition suggests that oral argument would assist the Court in assessing its merits as to why the remaining claims should be dismissed and "would ensure the Court has all necessary information before it rules on the Motion for Summary Judgment."  *Id.* However, from the size of the pleadings that were filed, the Court would assume that neither party has left no argument or piece of "evidence" uncovered.  The Court will decide the merits of the motions on their merits based on the parties' filings, and denies the request for a hearing.

## DISCUSSION

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial; the nonmoving party may not rest on mere allegations or denials in her own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242,

256-57 (1986). In order to avoid summary judgment, the nonmoving party must set forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor. *Id.* at 249. A mere scintilla of evidence in the nonmovant's favor is not sufficient to defeat a motion for summary judgment. *Id.* at 252. Rather, "if the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate." *See id.* at 249-50 (citation omitted).

The Court will address both summary motions in this opinion since the relevant facts, claims and arguments are common to both Defendants Expedition and Patterson and because of the close relationship between these two defendants.  New Mexico law governs this case because it was brought to federal court based on diversity jurisdiction. *See Armijo v. Ex Cam, Inc.*, 843 F.2d 406 (10th Cir. 1988) (In a diversity action, federal courts are required to apply the law of the forum state).

## I.  Count 4: Breach of Contract

Plaintiff appears to assert a breach of contract claim with respect to both the Black Mesa Agreement (also referred to as the "New Agreement") and the Joint Venture Agreement.  The Court previously ruled that Plaintiff is neither a party nor an intended beneficiary to the Black Mesa Agreement and so he cannot proceed on a breach of contract claim based on that agreement. Doc. 54 at 10-11.  Plaintiff was a party to the Joint Venture Agreement. *See id.* at 9 (noting that Plaintiff is a party to the Joint Venture Agreement although he could not sue the Cook defendants because they were not parties). The signatories for that agreement were Plaintiff Roberts and Defendant Patterson as Managing Member of Expedition Resources. Doc. 94-1. Thus, the Joint Venture Agreement is the only agreement that is relevant to the breach of contract claim.

Defendants move for summary judgment on three separate grounds: (a) Plaintiff's claims against a dissolved corporation are untimely under Florida's safe harbor statute; (b) Plaintiff cannot

establish the essential elements of his claim; and (c) Plaintiff's claims are based on the interpretation of proprietary and scientific methods; he failed to endorse an expert to provide the necessary testimony. The Court need not address the timeliness argument because Defendant prevails on other grounds.

A.     Contract Provisions

Plaintiff may proceed on his breach of contract claim because he was a party to the Joint Venture Agreement. However, in order to prevail on this claim, he must demonstrate that the expedition as described in the Agreement was successful in recovery. The Court is required to apply New Mexico law to the Agreement. *See Houston Gen.Ins.Co. v. American Fence Co.,* 115 F.3d 805, 806 (10th Cir. 1997) (law of forum state governs interpretation of insurance contract in contractual disputes before a federal district court sitting in diversity). However, Florida law applies under the express provisions of the Agreement, and parties do not present any argument to the contrary. *See* Doc. 94-1 at 8 (Article IX(e): "Applicable Law").  Under Florida law, in order to prevail on a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages.  *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017).

Under the Joint Venture Agreement, if the Expedition did not produce any results, Plaintiff was not entitled to any recovery or repayment. Doc. 94-1 at 8 (Article VIII: "Dissolution and Liquidation": "The Joint Venturers shall look solely to the assets of the Joint Venture for payment of any debts or liabilities owed by the Joint Venture to the Joint Venturers and for the return of their capital contributions."  Plaintiff also agreed to "cover all the food and lodging costs . . . while working on the expedition . . .; provide camping equipment, a 34 foot travel trailer, an ATV, a 1994 4x4 pickup, a 2006 Escalade, supplemental equipment and operating costs" for the expedition.

20

Doc. 94-1 at 4.  The contract further provides that Plaintiff "will be responsible for securing all the funding that the Joint Venturers need for the duration and success of the Black Mesa Project," purchase various scientific equipment, and pay Donald Patterson, Jerry Kemler, and John Melcanon monthly salaries.  *Id.*  The Agreement addresses payback of capital:

> Both parties agree that any capital contributed by GW is risk capital and ER shall not have any extending liabilities should the Joint Venture not produce any results. However, both parties agree that ALL capital provided by GW in this Joint Venture for equipment, travel, lodging, food and/or any other related costs related to this joint venture shall be returned to GW prior to any distributions. **GW has the right to receive such consideration in cash upon liquidation of items recovered and/or the assets recovered.**

Doc. 94-1 at 5 (emphasis added).

In short, Plaintiff was not entitled to any share or remuneration for any of his funding contribution unless gold and other artifacts were recovered from the Expedition. To show this, Plaintiff must present evidence countering Defendant's statement of fact that the Expedition was not successful, and this he has not done.  Plaintiff offers not *one* witness statement or affidavit supporting his story that Defendants returned to Black Mesa on their own, recalculated new GPS locations which they concealed from Plaintiffs and *which identified underground caverns of gold*, presented and then returned again to excavate and steal the gold, which they now have. Without evidence of this last contention, Plaintiff has no case.

Plaintiff puts much stock in the yellow pages of "raw data" compiled by Floto, Kemler and Patterson. He claims that Floto modified this data using "inverse numbers" in order to generate a fraudulent report to present to Richard Cook and which would throw others off the scent of the gold locations. *See* Doc. 99-9.  Plaintiff also relies on picture of an area of the field site which may or may not have been an excavation site.  There is no indication whether actual digging occurred there, or whether anything at all was found (much less gold treasaure).  Plaintiff insists that there

is sufficient "circumstantial evidence" from which to infer that gold lay beneath the GPS locations, based on the raw data with Floto's new GPS plottings, Richard Cook's treasure map and certain rock formations in the area. He is convinced that Defendants are now trying to launder this money simply because a business associate lent Patterson $90,000 to outfit a boat for a new expedition on a handshake and mentioned buying "new" gold and silver, and because Melancon was able to come up with $1.4 million to pay an off-shore satellite company to scan Black Mesa for three weeks for more gold.

This is not the stuff from which reasonable jurors would infer that (a) the Joint Venturers actually located Spanish Vaults filled with gold and silver under Black Mesa; (b) that they struck even more gold behind Plaintiff's back; (c) they went back again to dig it up and hide it away; and (d) are now working hard with their financier friends to launder the spoils and use it toward finding and retrieving an even bigger treasure –one that will wipe out the national debt overnight. Plaintiff's case has nothing to do with showing what actually happened, but rather what he believes happened, and the evidence he presents is not much more than conjecture.  Thus, if there is no evidence from which a reasonable juror can find that the Joint Venturers found success on their Black Mesa Expedition, then there is no way Plaintiff can survive summary judgment on his Breach of Contract claim.

Plaintiff offers no evidence refuting Defendants' claim that the Expedition was unsuccessful in that it did not recovery any gold, silver or valuable artifacts and offers no argument as to why the contract provisions are not enforceable.  Thus, as a matter of law, Defendants did not breach the Agreement because Plaintiff is entitled to nothing under the Agreement.[14]

---

[14] Application of New Mexico law would result in the same conclusion. Under New Mexico law, a person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused. *See* N.M.R.A., Civ. UJI 13-822; *see also Sw. Rock Prod., LLC v. J.A.R. Concrete, Inc*., No. CIV 12-0180 JB/GBW, 2013 WL 6504341, at *11 (D.N.M. Nov. 21, 2013) (citing elements of

B.    Expert Witness

Defendant argues that Plaintiff cannot support his claims without an expert, but Plaintiff disagrees that his claims are based on the interpretation of proprietary and scientific methods requiring the testimony of an expert.

Plaintiff's contract claim rests solely on whether he has shown a dispute of fact regarding whether gold was located and found during the Expedition. This issue depends largely on the interpretation of a considerable number of geotechnical documents, geophysical scans and other kinds of scientific and archeological "evidence." Plaintiff himself admits that he has no understanding of how Floto's "proprietary science" located underground gold treasure using spikes in electrical current, and yet he is convinced that gold is buried there. *See* Doc. 98-19 at 7 ("While I do not understand the science behind this phenomenon, it really does not matter as I am not the science teacher."). Plaintiff has the burden of proving his case by the greater weight of evidence, *see* NM UJI 13-30, but Plaintiff cannot be his own expert by offering his interpretation of the scientific and technical evidence he presents.  Fed.R.Evid. 702, 703.

The Court agrees with Defendants that Plaintiff needed an expert to support his claims that gold was located at the expedition site.  However, this does not mean that an expert would have made a significant difference in the outcome of the case because Plaintiff has failed to offer any evidence relating to Defendants' alleged theft and laundering of the gold.  Plaintiff offers no witness statements or physical evidence (except for a plot of ground where the dirt may or may not have been moved at one point) to even remotely suggest that Patterson, Floto and Kemler returned to the expedition site without him, found new GPS locations for the gold, dug up the gold

---

breach of contract under New Mexico law as existence of a contract, breach of the contract, causation and damages). Defendants were not required to "perform" under the Agreement in sharing any of the assets from the Expedition because none were acquired.

and then concealed the treasure from him.  Thus, even an expert would not have meant that Plaintiff would have survived either of the summary judgment motions.

Because Plaintiff has not presented any evidence from which a reasonable juror could infer that gold was located and retrieved from Black Mesa, he cannot show that the Expedition was successful and therefore cannot show any breach of the Joint Venture Agreement.  Defendants are entitled to summary judgment on that claim.

## II.    Counts 8, 10 and 11

Defendants are correct that Plaintiff's claims are grounded entirely in his Breach of Contract claim in Count 4 and that he has no other claims.

### A.    Count 8: Breach of Covenant of Good Faith and Fair Dealing

Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract. *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234–35 (Fla. Dist. Ct. App. 2001). This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement." *Id.* However, there are two restrictions on causes of action for the breach of good faith and fair dealing. First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties. Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached. *Id.*

Plaintiff alleges that Defendants have conspired to deprive him of his share of the gold from the Expedition but he does not point to any express provision of the Joint Venture Agreement that was breached.  Plaintiff would not be entitled to any payment or share under the Agreement except from assets acquired during the Expedition and only upon liquidation of those assets.  He

does not (and cannot) claim that he and the others found the gold they were looking for and Defendants are now refusing to give him his share.  Instead, he contends that he is entitled to a share of treasure that was excavated in his absence and hidden from him.  At best, Plaintiff's breach of contract claim can be posed as this:  *If* Defendants found treasure without him, then the contract was breached.  Because Plaintiff offers no evidence suggesting that this actually occurred, his contract claim does not get off the ground.  Also, under Florida law, Plaintiff cannot invoke a claim of covenant of good faith to override the express terms of the Agreement, which means that Plaintiff cannot claim that Defendants dealt with him unfairly in order to get around the contract provision which entitles Plaintiff to remuneration only from assets that were recovered as part of the Expedition.[15]  This claim also cannot withstand summary judgment.

> B.      Equitable Claims: Counts 10 and 11

Counts 10 and 11 (Promissory Estoppel and Quantum Meruit/Unjust Enrichment) are grounded in equity. Plaintiff contends that he conferred a substantial benefit on Defendants: he invested over $120,000 in cash, his personal time and knowledge during the Black Mesa Expedition; and he provided the ability to operate scientific equipment used on the site that directly resulted in the discovery of the Spanish Vaults. He also claims that he relied on Defendants' misrepresentations and in doing so, lost his investment to the unjust enrichment of Defendants.

Plaintiff cannot assert an unjust enrichment claim where he was a party to the Agreement and so this claim must be dismissed as a matter of law. *Ontiveros Insulation Co., Inc. v. Sanchez*,

---

[15] New Mexico law also recognizes that a duty of good faith and fair dealing exists in every contract. *See Jaynes v. Strong Thorne Mortuary, Inc*., 1998 NMSC 004, & 13, 124 N.M. 613, 954 P.2d 45, 49 (1997). The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. *See Watson Truck & Supply Co., Inc. v. Males*, 801 P.2d 639, 642, 111 N.M. 57, 60 (N.M.,1990)  (a party's intentional use of the contract to the detriment of another party constitutes bad faith and clear is a breach of the covenant of good faith and fair dealing).  Plaintiff alleges that Patterson, Floto and Kemler returned to Black Mesa without him in order to use Floto's "proprietary science" to find new GPS locations for gold treasure.  Because Plaintiff does not present any evidence that this happened, Plaintiff cannot show that Defendants dealt with him unfairly.

129 N.M. 200, 3 P.3d 695 (N.M.App.,2000) (The unjust enrichment theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity). Further, the Court is compelled to point out that there is no evidence that Defendants were unjustly enriched by any treasure find—with or without Plaintiff.

Plaintiff claims that Defendants (including Patterson and Kemler, but not Floto) "deliberately made representations and promises" regarding the Expedition, but he is not specific about what those misrepresentations were; nor does he explain them further in his responses to Defendants' motions for summary judgment. Doc. 3 at 40, ¶¶211-2214. Since Plaintiff's only claim is based on contract, the Court assumes that these alleged misrepresentations may concern the identification of new GPS targets located when Defendants allegedly returned to the expedition site and dug up the gold without him. Even so, there is no evidence supporting Plaintiff's contention that Defendants generated "fake" data sheets or that these were designed to mislead Plaintiff about where the gold was actually located; or that Defendants ever carried out an excavation of the site in his absence.

## III.   Miscellaneous Matters

The parties have raised other matters in their briefs which the Court addresses here in order to dispose of all remaining issues in this case.

### A.   John and Jane Does

Plaintiff filed his complaint on October 19, 2018, naming eleven defendants and "John Does and Jane Does." Plaintiff has never specified who these individuals might be; has never requested discovery in order to obtain more information as to their identity or what claims might be asserted against them; or sought leave to amend the complaint in order to add parties. *See, e.g., Watson v. Unipress, Inc.*, 733 F.2d 1386 (10th Cir. 1984) (where plaintiff seeks to substitute a

named individual for a "Doe" defendant, the proper manner in which to proceed is to seek leave to amend the Complaint pursuant to Fed. R. Civ. P. 15).  These individuals are therefore DISMISSED from this case with prejudice.

B.   Default Requested Against Plaintiff

Both Defendants claim that Plaintiff is in default because he did not timely answer its counterclaim which was filed on June 12, 2019, although no proper motion for an entry of default was ever filed as to Plaintiff.  *See* Doc. 94 at 7; Doc. 96 at 11; Doc. 76 at 22. Further, because this case is resolved on its merits, default judgment is not appropriate.

C.   Defendants' Requests for "Damages," Fees and Costs

Defendant Patterson requests "damages" of $2,000 in unpaid wages from March 2013 and legal fees in the amount of $13,168.50 (presumably for legal representation for his company, Expedition).  The Court DENIES this request; all parties will bear their own costs, fees and any "damages" for any difficulties (real or imagined) that they believe occurred as a result of opposing parties' conduct.

D.   Recently Filed Motions by Plaintiff (Docs. 103, 104, 105 and 106)

Plaintiff recently filed a "Response to Defendant's Reply in Support of Motion for Summary Judgment" – which is essentially a surreply, without first seeking leave of Court.  *See* Doc. 103.  Even if he had, the Court has reviewed all the evidence necessary to rule on all remaining matters in this case.  Accordingly, the Response is hereby STRICKEN.

Plaintiff also filed a request for an extension of time to prepare his portion of the proposed pretrial order.  Doc. 104 This request is DENIED, in light of the Court's disposition of the case.

Plaintiff filed a Motion to Admit New Evidence under Rule 60, *see*  Doc. 105, in which he basically seeks to start discovery over in order to propound new discovery requests, to take

depositions and to present newly discovered evidence (for example, evidence that Patterson was posting geophysical equipment on Craig's list).

Plaintiff filed a Motion to Ignore Filing and Grant Permission to Re-File, filed April 15, 2020 (Doc. 106).  In this motion, Plaintiff endeavors to correct his failure to seek leave of Court before filing a surreply, but he offers nothing in the motion to persuade the Court that a surreply would be helpful to the Court or to Plaintiff at this point.

     E.    <u>Court Will Issue Separate Order Regarding Defendant Caster</u>

Finally, the Court will issue a separate Order regarding the disposition of Defendant Caster, against whom a default judgment was entered.  *See* Doc. 48.

## CONCLUSION

In sum, the Court finds and concludes that Plaintiff's claims are solely contractual in nature, based on the Joint Venture Agreement to which he was a party.  Plaintiff has not presented any evidence from which a reasonable juror could infer that gold was located and retrieved from Black Mesa and thus he cannot show that he was entitled to any remuneration, payment or share under the express provisions of the Agreement.  Defendants are each entitled to summary judgment on their respective motions.

**THEREFORE,**

**IT IS ORDERED** that:

(1) Defendant Expedition's Motion for Hearing (**Doc. 97**) is hereby DENIED for reasons described in this Memorandum Opinion and Order;

(2) The Motion for Summary Judgment filed by Defendant Expedition Resources, LLC ("Expedition") (**Doc. 94**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order;

(3) The Motion for Summary Judgment filed by Defendant Patterson (**Doc. 96**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order;

(4) The "Doe" Defendants are hereby DISMISSED  WITH PREJUDICE;

(5) Defendants' request for ATTORNEY FEES, COSTS and other "damages" are hereby DENIED; fees and costs – each party shall bear; and

(6) Plaintiff's "Response to Defendant's Reply in Support of Motion for Summary Judgment" (**Doc. 103**) is hereby STRICKEN;

(7) Plaintiff's Motion for Extension of Time to File Proposed Pretrial Order (**Doc. 104**) is hereby DENIED;

(8) Plaintiff's Motion to Admit New Evidence under Rule 60 (**Doc. 105**) is hereby DENIED; and

(9)  Plaintiff's Motion to Ignore Filing and Grant Permission to Re-File (**Doc. 106**) is hereby DENIED.

An Order of Judgment shall be entered separately.

_____

CHIEF UNITED STATES DISTRICT JUDGE